**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AUDREY METZGER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.   21-cv-1798** |
| | : | |
| **KILOLO KIJAKAZI,**[1] | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                    **November 29, 2022**

 Plaintiff Audrey Metzger brought this action seeking review of the Acting Commissioner of Social Security Administration's (Acting Commissioner) decision denying her claim for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f. This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

**I.     PROCEDURAL HISTORY**

 Plaintiff filed for SSDI and SSI, alleging disability since May 1, 2017, due to bilateral carpal tunnel syndrome, herniated discs in the lumbar spine, arthritis, epilepsy, neuropathy, hypertension, Lynch syndrome, anxiety, depression, and chronic pain.  (R. 188-94, 223).

---

[1]  Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been substituted for Andrew Saul as the Defendant in this case.

Plaintiff's applications were denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 109-11, 126-37).  Plaintiff, represented by counsel, and a vocational expert testified at the January 31, 2020 administrative hearing.  (R. 41-76).  On February 20, 2020, the ALJ issued a decision unfavorable to Plaintiff.  (R. 14-40).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on February 16, 2021, thus making the ALJ's decision the final decision of the Acting Commissioner for purposes of judicial review.  (R. 1-6).

On April 18, 2021, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On May 10, 2021, Plaintiff consented to my jurisdiction. (Consent Order, ECF No. 4).  On November 30, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  On December 30, 2021, the Acting Commissioner filed a Response, and on January 13, 2021, Plaintiff filed a Reply.  (Resp., ECF No. 11; Reply, ECF No. 12).

## II.    FACTUAL BACKGROUND[2]

The Court has considered the administrative record and summarizes the evidence relevant to the instant request for review.  Plaintiff completed high school and has an associate's degree. (R. 224, 711).  She previously worked as a chef, a café owner and a supervisor at Home Depot. (R. 225).

---

[2]  Because the Court's ruling in this matter implicates only the ALJ's analysis at step three of the five-step sequential evaluation, regarding whether Plaintiff's mental impairments meet the criteria for Listing 12.04 (depressive, bipolar and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders), the Court summarizes only the evidence relevant to these listings.

A.      **Medical Evidence**

In October 2016, Plaintiff was admitted to the intensive care unit (ICU) at Grand View Hospital in Sellersville, Pennsylvania, after an attempted suicide.  (R. 503).  On October 18, 2016, she was released to Brooke Glen Behavioral Hospital (Brooke Glen) in Fort Washington, Pennsylvania.  (R. 503).  She reported THC use but alcohol sobriety for the last five years.  (*Id.*).  She was diagnosed with bipolar II disorder, depressed, with psychotic features; and attention deficit hyperactivity disorder.  (R. 504).  Plaintiff presented as evasive, guarded, sad, depressed, angry and apathetic with slow speech and limited insight and judgment.  (R. 503).  She refused medication and discharged herself on October 22, 2016, to pursue outpatient treatment.  (R. 504).

On August 10, 2017, Plaintiff presented to the Horsham Clinic (Horsham) for suicidal ideation, without a specific plan for self-harm, and worsening symptoms of depression and anxiety.  (R. 523).  She was unable to contract for safety outside of the hospital.  (*Id.*).  She claimed she had six prior overdose attempts in the past year, plus two strangulation attempts, and that many of these attempted suicides required her to be admitted to the ICU.  (*Id.*).  She indicated she was not taking any psychiatric medications except Adderall.  (*Id.*).  She further reported that she was homeless.  (*Id.*).  In this record, Plaintiff claimed that she had been sober since 2011.  (*Id.*).  After admission, she was depressed, irritable, labile and anxious with continued fleeting suicidal ideations and feelings of hopelessness and helplessness.  (*Id.*).  In her mental status examination, Plaintiff was alert and oriented, clean, appropriately dressed, restless, anxious and cooperative with an inappropriate affect, normal speech and though processes, average intellect, intact memory, fair judgment, and limited insight.  (*Id.*).  She was again diagnosed with bipolar disorder, type II, as well as borderline personality traits, and prescribed medications including Neurontin, Topamax and Vistaril.  (R. 523, 525).  At discharge on August

18, 2017, Plaintiff claimed that she had been sober for only six months.  (R. 525).  She was

referred to Livengrin Foundation in Levittown, Pennsylvania, for intensive outpatient services

and was to reside at Step By Step Recovery House in Bucks County, Pennsylvania.  (*Id.*).

On August 23, 2017, Plaintiff signed off on a treatment plan with Penndel Mental Health

Center (Penndel).  (R. 536-37).  In the treatment plan, Plaintiff identified goals of attending

every group therapy session.  (R. 536).  She also identified life situations involving a high risk of

substance abuse relapse, early warning signs of relapse, and coping skills and support

mechanisms to avoid relapse.  (R. 537).  At a December 14, 2017, assessment, Plaintiff had

pressured speech, a labile mood, fair judgment, intact language and knowledge, logical thought

processes and content, full orientation, and good insight, attention, and concentration.  It was

noted that she had made limited progress.  (R. 583-84).  On January 25, 2018, Plaintiff was

anxious, depressed, labile and irritable with poor thought processes, suicidal ideation in the form

of a passive death wish, full orientation, intact knowledge and language, fair insight and

judgment, and good attention and concentration.  (R. 586-87).

On September 13, 2017, Plaintiff was admitted for psychiatric hospitalization at

Fairmount Behavioral Health (Fairmount) in Philadelphia for anxiety, depression, and "thoughts

of suicide with a plan to jump off a bridge or building," although she was able to contract for

safety while in the hospital.  (R. 578).  She claimed to have "over 30 lifetime suicide attempts"

and that she was abused by her father when she was younger.  (*Id.*).  She reported that she was

homeless because she "left or was evicted" from the recovery house.  (*Id.*).  She admitted to prior

use of Ecstasy, methamphetamines, cocaine and marijuana and alleged that she was exposed to

psychotropic drugs at Horsham.  (*Id.*).  However, it was also observed that there were

"inconsistencies in the stories she tells" and that she was a "somewhat convoluted historian."

(*Id.*).  She further admitted that she was noncompliant with prescribed treatment and medications.  (*Id.*).  Noted stressors included the passing of her father, lack of income and lack of support.  (*Id.*).  She was fidgety, restless, distractible with pressured speech, dysphoric, irritable, negative, nihilistic/fatalist, long-winded and "difficult to work with," complained of depression and anxiety, distorted her interactions and conversations with her treating psychiatrist, and disparaged staff and other patients.  (R 578, 580).  Her cognition was grossly intact aside from distractibility.  (R. 578).  She denied hallucinations and delusions but referred to "spirits."  (R. 580).  She was diagnosed with unspecified mood disorder, major depression versus bipolar disorder, posttraumatic stress disorder (PTSD), borderline personality disorder, and alcohol, methamphetamine, MDMA, and cannabis use disorders, all in early remission. (R. 579).  A treatment plan was formulated for her suicidal ideation and depression, history of trauma, noncompliance with medication, psychosis, and smoking cessation.  (*Id.*).

By September 18, 2017, Plaintiff was still dysphoric and mildly agitated but had calmed down.  (*Id.*).  She continued to complain about staff and her treating psychiatrist and demonstrated paranoia with a distorted recitation of her interactions with others.  (*Id.*).  During the encounter, she became increasingly enraged and denied psychosis while demonstrating that she "clearly" was psychotic.  (*Id.*).  It was noted that Plaintiff was "psychiatrically unstable." (*Id.*).  On September 19, 2017, she was noted as still difficult to work with, yelling, screaming, making provocative and disruptive statements and criticizing staff.  (*Id.*).  She again became enraged when medications were discussed.  (*Id.*).  She submitted a 72-hour discharge notice and was discharged on September 21, 2017.  (R. 581).  At that time, she was clinically stable with no acute psychiatric symptoms.  (*Id.*).

5

In February 2018, Plaintiff presented to Lenape Valley Foundation (Lenape) in Doylestown, Pennsylvania, to obtain support services from its Partial Hospitalization Program and Transitional Outpatient Support (TOPS) program. (R. 705). She stated that she had been homeless since January, was currently living in a hotel room and had diagnoses for bipolar disorder and borderline personality disorder. (*Id.*). She reported having gone to Horsham to "sober up" and that she was not currently using drugs or alcohol. (*Id.*). She further reported hypomania "in the form of fast talking, racing thoughts, lack of sleep, rarely eat[ing], and constantly being 'on the go; nonstop', lasting 'about a few weeks at a time,'" depression, "not showering for days, eating a lot, sleeping a lot (emotional eater), isolating, hopelessness, crying spells." (R. 705). Her mental status examination revealed a disheveled appearance, psychomotor agitation, anxiety/nervousness, good judgment, fair insight, a cooperative attitude, goal directed thoughts, intact cognition, and no hallucinations, delusions, or suicidal thoughts. (R. 711-12). The evaluator diagnosed Plaintiff with bipolar II disorder, assessed a GAF[3] score of 45 and recommended her for admission to the TOPS program. (R. 713).

On August 29, 2018, Plaintiff presented to the Aldie Foundation (Aldie) in Doylestown, Pennsylvania, for serious anxiety, tension, inability to relax, and unreasonable worry in the last 30 days and earlier serious thoughts of suicide and trouble controlling violent behavior. (R. 932). She was alert and fully oriented with good eye contact and was "otherwise appropriate during assessment." (R. 938). She reported that she "was homeless for almost a year until she

---

[3]  A Global Assessment of Functioning (GAF) score is a "numerical summary of a clinician's judgment of [an] individual's overall level of functioning." *Miller v. Colvin*, 193 F. Supp. 3d 467, 476 (E.D. Pa. 2016). The GAF scale is "used by mental health professionals to 'assess current treatment needs and provide a prognosis.'" *Id.* A GAF score of 41-50 indicates serious symptoms; a score of 51-60 indicates moderate symptoms; and a score of 61-70 indicates mild symptoms. *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR)* 32 (4th ed. 2000).

was set up with housing through Lenape Valley and her case manager." (*Id.*). Plaintiff also received a drug and alcohol evaluation on this date. (R. 1012). She informed the evaluator that she was presently attending the TOPS program at Lenape and that she required the assessment for her parole officer even though she was no longer using drugs or alcohol. (*Id.*). She indicated that she had told Lenape that she no longer wished to take her psychiatric medications. (*Id.*).

In September 2018, Plaintiff reported abstaining from drugs and alcohol for the past year but worrying about relapsing. (R. 1010). She stated that she resides alone in a two-bedroom apartment. (*Id.*). In subsequent visits in September, October, and November, the therapist, Carrie Uzelac, MA, noted that Plaintiff is often tangential and easily frustrated by those she perceives as insufficiently direct or sensitive. (R. 1006, 1008). She expressed a desire to get her driver's license back and to change careers from "culinary/restaurant work to auto mechanic school." (R. 1008). Ms. Uzelac also recorded that Plaintiff often talked "at" her for extended periods without breaking because she "doesn't like silence" and without actually discussing her feelings, and that Plaintiff might benefit from revisiting her decision to change from five bipolar medications to zero. (R. 1002-04). Plaintiff claimed that she was diagnosed with obsessive compulsive disorder as a child and that when there is silence "she starts thinking of things she may have forgotten to do . . . ." (R. 1002). However, Plaintiff reported that she benefitted from therapy. (R. 1003). Plaintiff also reported staying up late and sleeping during the day, which the therapist further identified as potentially triggering and requiring attention. (R. 1004). Ms. Uzelac repeatedly recorded during this period that Plaintiff had no observable psychiatric symptoms. (R. 996, 998-1008).

The notes from this period also indicate that Plaintiff was attempting to lose weight by exercising and improving her diet. (R. 1003). By December, she had lost 25 pounds. (R. 996).

She reported being stressed surrounding the holidays and that she had hired an attorney to facilitate the return of her driver's license.  (R. 996, 999).  She acknowledged sometimes craving Adderall but had remained sober.  (R. 1001).  She also completed her peer certification program and was looking for relevant work.  (R. 996).  She adopted a dog but returned it.  (R. 1000).

Plaintiff's treatment notes from Aldie also show relationship difficulties with others. Observations made by Ms. Uzelac include: "She also seems to have an all-or-nothing attitude toward relationships - she gets angry when she feels she's being used and breaks off the relationship without explanation" (R. 987); "people come to her for advice and she gets annoyed when they don't handle things the way she suggests" (R. 989); "She is open about the fact that she doesn't believe she received the mothering that she deserved when growing up - and seems to crave her family's attention while feeling resentful of them at the same time."  (R. 998).  In January 2019, Plaintiff had a disagreement with her significant other that she worried would end their relationship, but they were able to work through the matter.  (R. 994-95).  Plaintiff acknowledged that she has struggled "with developing meaningful emotional and physical connections with others."  (R. 971).

In January 2019, Plaintiff reported that she was "continuing to do well in her recovery," although Ms. Uzelac noted that she continued to have some interpersonal difficulties.  (R. 993). In March 2019, Ms. Uzelac observed that Plaintiff has unresolved feelings toward her mother but further stated that in "a positive sign of putting her own needs first" Plaintiff had recognized that she did not want to be part of a friend's recovery.  (R. 992).  Ms. Uzelac also recorded that Plaintiff's relationship with her mother was strained due to both women's substance abuse and that Plaintiff's suicide attempts had occurred during periods of heavy drug use.  (R. 991-92). Plaintiff expressed interest in applying for a medical marijuana card, but Ms. Uzelac highlighted

some of the problems associated with this plan.  (R. 988).  In April 2019, Plaintiff's son's friend briefly resided with her because he had nowhere else to go.  (R. 986-87).  At the end of the month, it was noted that Plaintiff had made friends at Aldie and "seem[ed] to be connecting in a healthy way."  (R. 985).

Plaintiff began sessions with a different therapist at Aldie, Renee Perrette, MA, in May 2019.  (R. 983).  Plaintiff informed Ms. Perrette in June 2019 that she had spent the weekend at a cabin with a friend.  (R. 978).  She also joined a church where she established connections with the other members and attended meetings.  (R. 975, 1020).  By August 2019, Plaintiff was "stable with moderate motivation."  (R. 963).  Plaintiff explained "that she had been able to hold and set boundaries and appears to recognize the importance of doing so within her relationships with others."  (R. 963).

Plaintiff also participated in individual and group dialectical behavioral therapy[4] at Lenape between February and November 2019.  (R. 788-850).  Diagnoses at intake included borderline personality disorder, bipolar disorder, generalized anxiety disorder and substance abuse disorders in remission.  (R. 788).  In her treatment plan, Plaintiff described wanting to obtain employment and live independently.  (*Id.*).  Other long-term goals included addressing her symptoms of bipolar disorder, developing a wellness routine and maintaining sobriety.  (R. 789). Mental status examination results while attending DBT were generally normal.  (*See, e.g.,*, R.

---

[4] "Dialectical behavior therapy (DBT) is a specific type of cognitive-behavioral psychotherapy developed in the late 1980s by Marsha M. Linehan to help better treat borderline personality disorder. Since its development, it has also been used for the treatment of other kinds of mental health disorders."  Lenape Valley Foundation, *Dialectical Behavior Therapy*, *available at* https://www.lenapevf.org/services/dialectical-behavior-therapy-dbt/ (last visited November 16, 2022).

797-826, 834-849).  During therapy sessions, Plaintiff worked on such coping skills as emotional regulation, mindfulness/orientation, distress tolerance and interpersonal effectiveness.  (*Id.*).

On April 8, 2019, while Plaintiff was at Lenape, Maryam Bickell, D.O. completed a psychiatric evaluation of her.  (R. 827-33).  Plaintiff reported that she was not on any psychiatric medications but was feeling well and sleeping and eating okay and that her mood and anxiety were stable and controlled.  (R. 827).  She denied symptoms of depression, mania or psychosis and any drug or alcohol use since April 2017.  (*Id.*).  Mental status examination results were normal and included appropriate appearance, full orientation, a cooperative demeanor, goal directed thoughts, no perceptual disturbances, no suicidal thoughts, intact memory and cognition, and normal speech, mood, and affect. (R. 831-32).  Diagnoses consisted of unspecified bipolar disorder, in remission, borderline personality disorder, generalized anxiety disorders, and substance abuse disorders in remission.  (R. 832).  Plaintiff reported living alone.  (R. 829).  Dr. Bickell assessed a GAF score of 70.  (R. 832).  Dr. Bickell concluded the evaluation: "Currently stable and doing well with active non pharmacological interventions. . . . No need to follow up unless client needs medication management."  (R. 833).  However, it was recommended that Plaintiff continued with group and individual therapy at Lenape and drug and alcohol counseling at Aldie.  (*Id.*).

On February 6, 2019, the psychological consultative examiner, Ronald Karpf, Ph.D., evaluated Plaintiff.  (R. 667-73).  Plaintiff traveled to the appointment alone by public transportation.  (R. 667).  She reported living alone at the time.  (*Id.*).  Plaintiff noted being hospitalized for psychiatric reasons "a number of times" and that she was currently attending Lenape for outpatient treatment twice weekly for the last year.  (*Id.*).  She reported no alcohol or drug use since April 2017.  (R. 668).  Her mental status examination revealed a cooperative

demeanor, satisfactory hygiene, poor posture, normal motor behavior, appropriate eye contact, normal speech, coherent and goal-directed thoughts, anxious and dysthymic mood, impaired concentration and attention (although she was able to perform simple calculations and complete serial sevens), mildly impaired memory, above average intellectual functioning, and good judgment.  (R. 669-70).  She reported being able to engage in personal care, cook and prepare food, do general cleaning and laundry, manage money and budget (albeit with poor spending skills), socialize with neighbors and community members, watch television, listen to music, talk on the phone, text, email, and use social media.  (R. 670).  Dr. Karpf diagnosed bipolar disorder (most recent episode moderate), PTSD, generalized anxiety disorder, and alcohol, cocaine and amphetamine abuse disorders in full sustained remission.  (R. 670-71).  He indicated that Plaintiff's prognosis was "[g]ood, given the claimant stays in treatment."  (R. 671).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Karpf determined that Plaintiff had no restrictions in understanding and remembering simple instructions or making judgments on simple work-related decisions; mild restrictions in carrying out simple instructions, understanding and remembering complex instructions, making judgments on complex work-related decisions, or interacting appropriately with the public, supervisors or coworkers; and moderate restrictions in carrying out complex instructions or responding appropriately to usual work situations and to changes in a routine work setting.  (R. 680-81).  Dr. Karpf indicated that Plaintiff's impairments do not her affect her other capabilities, such as her ability to adapt or manage herself or concentrate, persist, or maintain pace.  (R. 681).

On March 4, 2019, a State agency psychological consultant, John Rohar, Ph.D., determined that Plaintiff is moderately limited in her ability to understand, remember and carry

out detailed instructions; to maintain attention and concentration for extended periods; to complete a workday or workweek without interruption from psychologically based symptoms; and to respond appropriately to changes in work setting. (R. 88-89). Dr. Rohar determined that Plaintiff was not significantly limited in any other area of mental functioning. (*Id.*).

On September 9, 2019, Dr. Bickell completed a Medical Opinion Re: Ability to Do Work-Related Activities (Mental). (R. 757-59). She opined that Plaintiff had a limited but satisfactory ability to ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, and adhere to basic standards of neatness and cleanliness; a seriously limited ability to remember work-like procedure and understand, remember and carry out very short and simple instructions; an inability to meet competitive standards in maintaining attention for a two hour segment, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, interacting appropriately with the general public, and responding appropriately to changes in a routine work setting; and no useful ability to deal with normal work stress, get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes, accept instructions and respond appropriately to criticism from supervisors, perform at a consistent pace without an unreasonable number and length of rest periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, sustain an ordinary routine without special supervision, and maintain regular attendance and be punctual within customary, usually strict tolerances. (R. 757). Dr. Bickell predicted that Plaintiff would miss more than three days of work per month. (R. 758).

In an attached interrogatory response, Dr. Bickell indicated that there was evidence of ongoing, effective medical treatment in the form of Plaintiff's group and individual DBT, as well

as her Health Connections nursing services she receives.  (R. 759).  Dr. Bickell also indicated

that there was evidence of Plaintiff's "marginal adjustment."  (*Id.*).  She opined that there was

"no room" in Plaintiff's treatment regimen for "environmental or daily life changes" and that

"[e]ven small changes could result in significant decompensation."  (*Id.*).

### B.    Non-medical Evidence

The record also contains non-medical evidence.  On December 27, 2018, Plaintiff

completed an Adult Function Report.  (R. 241-50).  In the report, she indicated that she lives

alone in an apartment.  (R. 241).  She stated that it was "impossible to function" some days due

to severe depression and that PTSD sometimes caused her overwhelming anxiety, flashbacks, or

triggers.  (*Id.*).  She described her normal day as awakening at 8 a.m., attending appointments or

group care, then going to the gym or engaging in another "self-care" activity.  (R. 242).  She

checked a box indicating that she takes care of others and explained that she helps friends with

emotional support and tasks.  (*Id.*).  Plaintiff claimed to sleep too much or too little depending on

her emotional state.  (*Id.*).  She needs reminders or alarms for personal care and medication.  (R.

243).  She can prepare meals, clean, do laundry, shop in stores and online, maintain a journal,

meditate, listen to music, manage money and bills, socialize with others (approximately five days

per week), use public transportation and ride share apps, walk places, ride in a car, and drive,

although her license is currently suspended.  (R. 241-45).  Plaintiff has problems getting along

with authority figures due to past negative interaction with the police and problems getting along

with others generally due to disagreements over political, religious, and moral matters.  (R. 246-

47).  She has been fired or laid off from jobs for her inability to get along with others but her

"attitude at the workplace is manageable with routine and understanding."  (R. 247).  She also

checked boxes indicating problems with concentration and understanding and claimed to have

13

problems handling stress or changes in routine.  (R. 246-47).

Plaintiff also submitted a "timeline" describing her personal and medical history from October 16, 2017, to January 2020.  (R. 924-28).  According to the timeline, Plaintiff was hospitalized in mid-October 2016 due to an attempted suicide via Tylenol overdose.  (R. 924).  After being in intensive care for 72 hours in Grandview Hospital, she was involuntarily committed to Brooke Glen, where Plaintiff refused any treatment due to a lack of medical insurance at the time.  (*Id.*).  She was released 72 hours later.  (*Id.*).  In mid-April 2017, Plaintiff again attempted suicide by ingesting large amounts of liquor, Tylenol and Percocet, but recovered on her own without medical attention.  (*Id.*).  Plaintiff claims that she gave up alcohol and opiates after the incident.  (*Id.*).

In mid-August 2017, Plaintiff "was functionally homeless, crashing anywhere" she could.  (R. 925).  After an arrest, she admitted herself to Horsham due to depression, suicidal ideation and "withdraw symptoms from the stimulants . . . ."  (*Id.*).  At the end of the month, Plaintiff admitted herself into Penndel, an acute partial hospital, which Plaintiff describes as "more than intensive outpatient; however less than full inpatient."  (*Id.*).  In September 2017, Plaintiff went to the crisis center at Lower Bucks Hospital after experiencing depression, agitation, loneliness, suicidal ideation and "feeling very unheard."  (*Id.*).  The hospital placed her inpatient at Fairmount, which increased her medication dosage and prescribed new medications.  (*Id.*).  Fairmount initially refused to release Plaintiff because she was homeless but in early October 2017 sent her to a prior address where Plaintiff maintained a close relationship with the family who resides there.  (*Id.*).  Plaintiff returned to partial hospitalization at Penndel.  (*Id.*)  However, she remained homeless and began camping in a tent outside of Lenape.  (*Id.*).

On October 26, 2017, Plaintiff was arrested on a bench warrant, allegedly because the court notice was mailed to an old address. (*Id.*). Plaintiff was released on November 9, 2017, with stipulations to seek treatment from the Mobile Crisis Team (Mobile Crisis) at Lenape, otherwise continue treatment and actively pursue employment. (R. 926). At this time, she also returned to Penndel and began their TOPS program. (*Id.*). She was able to sleep on a friend's couch from late November to late December, when she moved to a hotel. (*Id.*). After Mobile Crisis located Plaintiff in the hotel, in late January 2018 she was reevaluated by a doctor at Lenape, who recommended a partial hospitalization program. (*Id.*). Plaintiff alleges that she was sexually assaulted at the shelter in which she was living, causing her to stop treatment temporarily other than her medications. (*Id.*). In February 2018, Plaintiff moved to a hotel, with assistance from her mother. (*Id.*).

In March 2018, Plaintiff was arrested on another bench warrant, again allegedly due to a lack of a permanent address, and spent approximately a week and a half in jail. (*Id.*). While incarcerated, Plaintiff "weaned off of the medications" she was taking and refused to restart them when she returned to Lenape. (R. 927). In April 2018, Plaintiff returned to TOPS. (*Id.*). Dr. Bickell allegedly told Plaintiff that as long as she continued to see her a few times per week Plaintiff could remain off medications "for the time being." (*Id.*). Plaintiff only missed two sessions at TOPS and at the end of September 2018 began DBT at Lenape, a six-month program for those who have "show[n] willingness to improve, good attendance to previous groups, and compliance with recommendations." (R. 927). Around this time, Plaintiff was also evaluated for drug and alcohol rehabilitation at Aldie. (*Id.*). The therapists there recommend a mix of individual and group counseling sessions. (*Id.*). In December 2018, Plaintiff completed a two-week program to become a certified peer support specialist. (*Id.*).

In April 2019, Plaintiff experienced physical pain, irritability, isolation and avoidance but was able to work through these issues with continuing therapy.  (*Id.*).  In September 2019, Plaintiff graduated from DBT.  (*Id.*).  The facilitators assured her that she had made "significant changes" since starting the program, and Plaintiff agreed that she had improved her mental and emotional coping skills.  (*Id.*).  In September 2019, Plaintiff facilitated a peer group at Aldie at its request.  (*Id.*).

In January 2020, Plaintiff re-enrolled at TOPS due to seasonal depression and challenges with family members.  (*Id.*).  She explained:

> It is because the progress I have made in my self-healing journey that I am able to find the perspective and strength within myself to know I am in current need of a higher level of mental health care and support. . . . Without the self-work I have already done I might not have gotten through it but because I am able to focus on my mental health, physical pain and addiction recovery I am able to assess when I need additional support to prevent relapse of any kind.

(R. 927-28).

Later in the month, she reported continuing with Aldie and Lenape, as well as running her own group sessions, which helped with her loneliness and disengagement.  (R. 928).  She claimed that her prior drug use was to push through physical pain and that "working is impossible" now that she is drug-free.  (R. 928).  She further claimed that her "anxiety and mental health issues can be absolutely disabling" and affect her sleep, appetite, and hygiene.  (*Id.*).  She stated that when her "depression is at an all time low" she has crying spells and suicidal emotions and it becomes "challenging to access" the otherwise "enormous amount of skills" she has built up over the past few years of treatment.  (*Id.*).

Plaintiff closed her timeline with the following summation:

16

> I have managed to get myself to a really good place. I have started
> a successful, loving and supportive relationship. I am maintaining
> my therapy and group schedule and keeping sober, clean and
> optimistic. I have dedicated myself to staying mentally healthy and
> to managing my physical body and pain to the best of my ability. I
> have finally found a rhythm and routine that keeps me safe, off the
> streets, sober and in a good place within myself. I have graduated
> DBT and become a Peer Support Specialist and have begun a
> group based in an interest of mine to help pay it forward to others.
> I have done all of this because of my ability to access the care I
> have needed and to maintain that level of care as well as to remove
> the pressures of pushing my body through tremendous pain and
> mental distress of being overworked in jobs that don't value me
> and in family and personal relationships that bring me down as
> well. In order for me to continue to maintain this level of mental
> health, recovery, sobriety and tolerable pain management I hope to
> remain in the routines and structures I have cultivated for myself
> so I can continue to live a life worth living.

(R. 928).

At the administrative hearing on January 31, 2020, Plaintiff testified that she lives alone in an apartment and that she receives financial assistance from her mother, SNAP food benefits, and health insurance from Keystone First.  (R. 50).  She has a driver's license suspended due to prior convictions for driving under the influence.  (R. 51).  She has extensive restaurant work experience, primarily cooking.  (R. 52).  She explained that she returned to the TOPS program for "added support" due to self-destructive thoughts, without action, brought on by dealing with her sister who was going through similar issues as Plaintiff had experienced.  (R. 54).  She also runs a weekly astrology group at Aldie.  (R. 55).  Plaintiff reported applying for several jobs based on her peer support person certification.  (R. 56).  She indicated that she has been sober since April 15, 2017.  (R. 57).  She testified that she had done a partial hospitalization, followed by TOPS, then DBT for the past year.  (*Id.*).  She explained that she has sessions at Lenape two mornings per week, one therapy visit per week, visits with Dr. Bickell "every couple of months," and weekly treatments at Aldie.  (R. 63).  On Friday, when Plaintiff normally has no

appointments, she prepares meals, catches up on tasks like laundry, and engages in "self-care."
(R. 64).  She described symptoms including depression, anxiety, racing thoughts progressing "to
a more self-destructive manner if I'm in a really bad or depressed place," paranoia and loss of
motivation.  (R. 65-66, 68).  She stated that Latuda "really benefited" her, but she stopped it due
to gaining 60 pounds in two months.  (R. 66).  She has been off all medication since April 2018.
(R. 67).

### III.    ALJ'S DECISION

Following the administrative hearing held on January 31, 2020, the ALJ issued a decision
in which she made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act
      through December 31, 2019.

2.    The claimant has not engaged in substantial gainful activity since February 1,
      2018, the amended alleged onset date.

3.    The claimant has the following severe impairments: carpel tunnel syndrome,
      degenerative disc disease of the lumbar spine, bipolar disorder, borderline
      personality disorder and generalized anxiety disorder.

4.    The claimant does not have an impairment or combination of impairments that
      meets or medically equals the severity of one of the listed impairments in 20 CFR
      Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that the claimant has the
      residual functional capacity to perform light work as defined in 20 CFR
      404.1567(b) and 416.967(b) except that she is limited to occasional reaching

overhead, but otherwise frequently reaching, handling, fingering, or feeling; to being able to shift positions from sitting to standing while continuing to perform tasks at the work station; to no climbing ladders, ropes and scaffolds or crawling but occasionally engaging in all other postural maneuvers; and to avoiding concentrated exposure to extreme temperatures, humidity, and vibration, but no exposure to workplace hazards. She is further limited to occupations that are typically self-paced, with no tandem or teamwork with coworkers on the same task and no rapid production rate work; to occasional interaction with supervisors, coworkers, or the general public; and to work in occupations where the work setting and work assignments are typically very similar from day to day.

6.     The claimant is unable to perform any past relevant work.

7.     The claimant was born on November 10, 1985 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.     The claimant has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security

Act, from February 1, 2018, through the date of this decision.

(R. 14-40).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 34).

## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In her request for review, Plaintiff raises five claims[5]:

> I. The Commissioner under whom the ALJ issued the final decision served a longer term than the President and was removable only for cause, in violation of the separation of powers; therefore, the decision is constitutionally defective and should be reversed.
>
> II. The ALJ inexplicably disregarded the opinion of the treating psychiatrist that Ms. Metzger fulfilled the "C" criteria of 12.04 and 12.06.
>
> III. The ALJ rejected the opinions of the treating psychiatrist for erroneous reasons, in violation of the regulations and law of this circuit.
>
> IV. The ALJ expressly credited the opinion of the state agency physician, but inexplicably failed to include the limitations she assessed in Plaintiff's RFC.

---

[5]  The Court sets forth and considers Plaintiff's arguments in the order corresponding to the five-step sequential analysis.

>     V. The ALJ failed to include all of Plaintiff's credibly established
>     limitations in her RFC and hypothetical question to the vocational
>     expert.

(Pl.'s Br., ECF No. 10, at 4-29).

### A.    Separation of Powers Argument

Relying upon the Supreme Court's ruling in *Seila Law LLC v. CFPB*, Plaintiff submits

that the structure of the Social Security Administration (SSA) is an unconstitutional violation of

the separation of powers because its head serves for a longer term than the President (six years)

but can only be removed by the President for cause ("neglect of duty or malfeasance in office").

(Pl.'s Br., ECF No. 10, at 4-6 (citing __ U.S. __, 140 S. Ct. 2183 (2020); 42 U.S.C. § 902(a)(3))).

She contends that she was deprived of a valid administrative proceeding because former

Commissioner Andrew Saul's promulgation of controlling regulations under which the case was

decided, as well as his delegation of authority to the presiding ALJ, were constitutionally

defective.  (*Id.* at 5-6).  She therefore requests that the ALJ's decision be reversed.  (*Id.* at 6).

In response, the Acting Commissioner agrees that Section 902(a)(3) violates the

separation of powers but insists that that fact alone does not warrant setting aside a denial of

disability benefits.  (Resp., ECF No. 11, at 4).  Citing the Supreme Court case of *Collins v.*

*Yellen*, she asserts that Plaintiff cannot show the required nexus between the provision and the

denial of her claim for two reasons.  (*Id.* at 5 (citing 141 S. Ct. 1761 (2021))).  First, she

maintains that "the deciding ALJ served under a ratification of her appointment by an Acting

Commissioner not subject to Tenure Protection, thus severing any nexus between the removal

restriction and Plaintiff's alleged harm."  (*Id.* at 6-8).  Second, she submits that Plaintiff is unable

to show that Section 902(a)(3) caused the denial of her benefits claim as required by *Collins*.

(*Id.* at 8-12).  On this point, she observes that unlike instances in which an agency official lacks

proper authority to occupy an office due to a violation of the Appointments Clause, agency action is not *per se* invalid simply because it can be traced back to an official subject to an unconstitutional *removal* protection.  (*Id.* at 8-9 (citing *Lucia*, 138 S. Ct. 2044 (emphasis in original))).  Instead, she argues that under *Collins* there can be no argument that the official exercised power he or she did not lawfully possess as long as the official was properly appointed. (*Id.* at 9).  Thus, in the Acting Commissioner's view, Plaintiff can succeed on her removal challenge only if the injuries were caused by an official subject to the removal restrictions *and* the restrictions themselves "inflict[ed] compensable harm" upon Plaintiff.  (*Id.* (quoting *Collins*, 141 S. Ct. at 1789)).  This showing, the Acting Commissioner insists, Plaintiff has not made. (*Id.* at 8-12).

As a separate argument, the Acting Commissioner posits that Plaintiff's request for a new administrative hearing should be denied under the harmless error doctrine, the de facto officer doctrine, the rule of necessity and "broad prudential considerations."  (Resp., ECF No. 11, at 12-16).  In her reply, Plaintiff counters that these "other arguments" are not persuasive.  (Reply, ECF No. 12, at 15-16).

Plaintiff further replies that she does not challenge the validity of the ALJ's appointment but rather the delegation of authority by Commissioner Saul because she "was subject to the unconstitutional removal protection at the time of th[e] decision."  (Reply, ECF No. 12, at 9). She insists that notwithstanding the Acting Commissioner's subsequent ratification of the ALJ's appointment, she derived her authority to issue her decision from Commissioner Saul, rendering it constitutionally defective.  (*Id.* at 9-10).  Next, she counters that "harm is presumed" because the matter involves government officials exercising authority that they did not lawfully possess in violation of the separation of powers.  (*Id.* at 10-12 (citing *Collins*, 141 S.Ct. at 1788; *Carr*,

141 S. Ct. at 1356-62; *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153-54 (3d Cir. 2020))).  She continues that even if a causal connection is not presumed, she has satisfied this requirement because without the illegal delegation of authority the ALJ and Appeals Council could not have issued their unfavorable determinations.  (*Id.* at 12).  In fact, she argues that the ALJ and Commissioner Saul share "an identity relationship" such that the decision of the ALJ is the decision of the Commissioner pursuant to 42 U.S.C. § 405(b)(1).  (*Id.* at 13).

In *Seila Law*, the United States Supreme Court found that a violation of the constitutional separation of powers occurs when an executive agency is led by a single head who serves for a longer term than the president and can only be removed from that position for cause.  140 S. Ct. 2183.  The Acting Commissioner agrees that the relevant provision of the Social Security Act, 42 § U.S.C. § 902(a)(3), violates the separation of powers to the extent that it limits the President's authority to remove the Commissioner without cause. (Resp., ECF No. 11, at 4).  However, the Acting Commissioner argues that this alone does not support setting aside Plaintiff's unfavorable disability determination because Plaintiff cannot show that the restriction actually caused her harm.  (*Id.*).

In 2021, the Supreme Court clarified its holding in *Seila* in *Collins v. Yellen*, 141 S. Ct. 1761.  In *Collins*, the Court held that an unconstitutional removal provision does not automatically render all actions taken by individuals subject to that provision void.  *Id.* at 1787.  The court explained:

> Although the statute unconstitutionally limited the President's authority to remove the [individual], there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the [agency] as void.

*Id.* (emphasis in original).  However, the court also found that "it is still possible for an

unconstitutional provision to inflict compensable harm." *Id.* at 1789.  In such a case, the plaintiff must show that the removal restriction was the cause of the harm he suffered.  *Id.*  In the context of Social Security appeals, "*Collins* requires [the plaintiff] to demonstrate a nexus between the decision denying [his] disability benefits and 42 U.S.C. § 902(a)(3)." *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *7 (E.D. Pa. 2022).

Notably, post-*Collins*, all the courts in this circuit that have considered such separation of powers arguments as the one raised here by Plaintiff have agreed, citing *Collins*, that they do not warrant remand.  *See, e.g., Andino*, 2022 WL 1135010; *Adams v. Kijakazi*, No. 20-3591, 2022 WL 767806, at *9-11 (E.D. Pa. Apr. 18, 2022); *High v. Kijakazi*, No. 20-3528, 2022 WL 394750, at *6 (E.D. Pa. Feb. 9, 2022); *Wicker v. Kijakazi*, No. 20-4771, 2022 WL 267896, at *8-10 (E.D. Pa. Jan. 28, 2022); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510 (D.N.J. Jan. 7, 2022); *Crossley v. Kijakazi*, No. 20-2298, 2021 WL 6197783, at *8 (M.D. Pa. Dec. 31, 2021).  Courts in other circuits have also reached the same conclusion.  *See, e.g. Shannon R. v. Comm'r of Soc. Sec.*, 572 F. Supp. 3d 1028, 1037-39 (W.D. Wash. 2021); *Alice T. v. Kijakazi*, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *Webb v. Kijakazi*, No. 1:20CV714, 2021 WL 5206498, at *15 at n. 12 (M.D.N.C. Nov. 9, 2021) (Report and Recommendation); *Lisa Y. v. Comm'r of Soc. Sec.*, 570 F. Supp. 3d 993 (W.D. Wash. 2021); *Robinson v. Kijakazi*, No. 1:20-CV-00358-KDB, 2021 WL 4998397, at *2-3 (W.D.N.C. Oct. 27, 2021); *Tracey Ann. P. v. Kijakazi*, No. 20CV1163-LAB(RBB), 2021 WL 4993021, at *18 (S.D. Cal. Oct. 27, 2021) (Report and Recommendation); *Robles v. Comm'r of Soc. Sec.*, No. 220CV01069JDPSS, 2021 WL 4285170, at *4 n. 6 (E.D. Cal. Sept. 21, 2021); *Angelita O. v. Kijakazi*, No. 1:20-CV-00034-AJB, 2021 WL 4146085, at *18 at n. 13 (N.D. Ga. Sept. 13, 2021).

Here, Plaintiff has not shown a nexus between the decision denying her disability benefits and Section 902(a)(3).  Citing cases involving violations of the Appointments Clause, she argues the ALJ lacked authority to preside over her case and that she is entitled to a new hearing with a constitutionally appointed ALJ.  (Reply, ECF No. 19, at 11-12).  However, as explained in *Collins*, an unconstitutional restriction upon the President's authority to *remove* an agency officer does not create a constitutional defect in the officer's *appointment* such that his or her actions are rendered void, unlike with a violation of the Appointments Clause.  141 S. Ct. at 1787; *cf. Lucia*, 138 S. Ct. at 2055 ("the appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official") (citing *Ryder v. United States*, 515 U.S. 177, 183, 188, 115 S. Ct. 2031, 132 L.Ed.2d 136 (1995)) (quotations omitted).

Plaintiff further argues that the adjudication of her claim by an ALJ delegated authority by a constitutionally defective Commissioner establishes a presumption of harm and that the ALJ and Appeals Council could not have issued the adverse determination in her case "but for" the Commissioner's unlawful delegation of authority to them.  (Reply, ECF No. 19, at 12, 14).  Nonetheless, the mere delegation of authority by the Commissioner does not constitute a sufficient nexus to satisfy the requirements of *Collins* or *Seila Law*.  In *Collins*, the injury suffered by the plaintiffs was directly traceable to an amendment adopted by the directors of the Federal Housing Finance Agency (FHFA) that materially changed the nature of certain financial agreements. 141 S. Ct. at 1774, 1779.  As a result, the plaintiffs in *Collins* had "an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the [amendment.]"  *Lisa Y.*, 2021 WL 5177363, at *7.  But it is not enough

26

for Plaintiff to trace her injury to the Commissioner's ability to delegate power to ALJs and to promulgate applicable rules and regulations; rather, she must be able to trace that injury to the actual unlawful conduct in this matter, which is the unconstitutional removal clause.  *See Wicker*, 2022 WL 267896, at *10 (citing *Collins*, 141 S. Ct. at 1779).  Unlike the FHFA Director in *Collins*, the Commissioner did not promulgate a new action affecting or injuring Plaintiff, and there is nothing to indicate that but for the unconstitutional removal clause the President would have removed the Commissioner and appointed a new Commissioner who would have decided Plaintiff's disability claim *differently*. *See id.* (finding Commissioner's delegation of authority to ALJs and Appeals Council did not constitute sufficient nexus to demonstrate standing under *Collins*).  As a result, Plaintiff has failed to show that the unconstitutional removal clause caused her harm.[6]

> Accordingly, remand on this basis is denied.

## B.      Listings at Step Three

> Plaintiff contends that substantial evidence does not support the ALJ's step three determination that her mental impairments did not meet or equal Listing 12.04 (depressive, bipolar and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders). (Pl.'s Br., ECF No. 10, at 12-14; Reply, ECF No. 12, at 3-4).  The Acting Commissioner counters that the ALJ properly concluded that Plaintiff did not meet the criteria for Listings 12.04 and 12.06.  (Resp., ECF No. 11, at 22-24).  The Court agrees with Plaintiff that the ALJ's decision is not fully supported by substantial evidence.

---

[6]  Because this Court agrees with the Acting Commissioner that Plaintiff's separation of powers argument fails due to Plaintiff's inability to show that the offending removal provision caused the denial of her claim, this Court does not address the Acting Commissioner's remaining arguments or Plaintiff's responses thereto.

At step three, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings that prevent an adult, regardless of age, education, or work experience, from performing any gainful activity.  20 C.F.R. §§ 404.1525(a), 416.925(a).  This inquiry functions to identify those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background, making further inquiry unnecessary.  *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990).  The claimant bears the burden of producing medical findings showing her impairments meet or medically equal a listed impairment.  *See Burnett*, 220 F.3d at 120 n.2.  To meet this burden, the claimant must establish all the requirements of the relevant listing.  *Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify"); *see also Hartung v. Colvin*, No. 12-6155, 2016 WL 2910096, at *5 (E.D. Pa. May 19, 2016).  Meeting a listing cannot be based on diagnoses alone.  20 C.F.R. §§ 404.1525(d) and 416.925(d).  Because matching or equaling a listing at step three results in an automatic finding of disability, the listings are strictly construed against claimants.  *See Sullivan*, 493 U.S. at 530-32.

Here, the ALJ identified Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders)[7] as relevant to Plaintiff's mental health impairments, but found her impairments were not severe enough to meet the listing pursuant to the criteria of paragraph "B" because they did not cause "at least two 'marked' limitations or one 'extreme' limitation" in the relevant areas of mental functioning.[8]  (R. 21).  The ALJ also found

---

[7]  The ALJ also identified Listing 12.08, relating to personality disorders, as relevant to Plaintiff's mental health impairments, Plaintiff's arguments do not concern this listing.

[8]  Specifically, the ALJ determined that Plaintiff had: (1) a mild limitation in understanding, remembering, or applying information; (2) a moderate limitation in interacting with others; (3) a moderate limitation in concentrating, persisting or maintaining pace; and (4) a moderate limitation in adapting or managing herself.  (R. 20-21).

that the paragraph "C" criteria were not satisfied.  (R. 21-22).  A claimant may satisfy the "C"

criteria of Listings 12.04 or 12.06 by showing that the claimant's mental disorder is "serious and

persistent;" that is, that the claimant has a medically documented history of the existence of the

disorder over a period of two years, and there is evidence of both: (1) medical treatment, mental

health therapy, psychosocial support, or a highly structured setting that is ongoing and that

diminishes the symptoms and signs of the mental disorder, and (2) marginal adjustment; that is,

minimal capacity to adapt to changes in the environment or to demands that are not already part

of the claimant's daily life.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C).  As set

forth in Section 12.00(G)(2)(c):

> The criterion in C2 is satisfied when the evidence shows that,
> despite your diminished symptoms and signs, you have achieved
> only marginal adjustment. "Marginal adjustment" means that your
> adaptation to the requirements of daily life is fragile; that is, you
> have minimal capacity to adapt to changes in your environment or
> to demands that are not already part of your daily life. We will
> consider that you have achieved only marginal adjustment when
> the evidence shows that changes or increased demands have led to
> exacerbation of your symptoms and signs and to deterioration in
> your functioning; for example, you have become unable to
> function outside of your home or a more restrictive setting, without
> substantial psychosocial supports (see 12.00D). Such deterioration
> may have necessitated a significant change in medication or other
> treatment. Similarly, because of the nature of your mental disorder,
> evidence may document episodes of deterioration that have
> required you to be hospitalized or absent from work, making it
> difficult for you to sustain work activity over time.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00G(2)(c).

Here, the ALJ's paragraph "C" analysis was as follows:

> I have also considered whether the "paragraph C" criteria are
> satisfied. In this case, the evidence fails to establish the presence of
> the "paragraph C" criteria because there is no medically
> documented history of a chronic depressive, bipolar or anxiety-
> related disorder accompanied by extreme limitations in one, or
> marked limitations in two, of the areas of mental functioning listed

> in paragraph B. There is no evidence that despite at least two years
> of medically documented treatment, the claimant has only
> marginal adjustment, that is, a minimal capacity to adapt to
> changes in the claimant's environment or to demands that are not
> already part of the claimant's daily life.

(R. 21-22).

Plaintiff first asserts that the ALJ failed to consider the opinions of Plaintiff's treating

psychiatrist, Dr. Bickell, regarding whether the severity of Plaintiff's impairments meet the

paragraph "C" criteria of Listings 12.04 and 12.06.  (Pl.'s Br., ECF No. 10, at 13).  Plaintiff is

incorrect on this point.  After summarizing Dr. Bickell's findings, which, as Plaintiff notes,

would have fulfilled these listings' paragraph "C" criteria if credited, the ALJ explained:

> Dr. Bickell's assessment is not significantly persuasive, because it
> is not substantiated by course of treatment or symptoms described
> in the contemporaneous treatment notes. Furthermore, Dr. Bickell
> assessed GAF score ranging between 55 and 70 between March
> and April 2019 (Exhibits 23F, 30F, 40F), which would indicate no
> more than moderate symptoms. However, I have considered the
> areas of limitation cited by Dr. Bickell in assessing claimant's
> residual functional capacity, though the degree of limitation to
> which she opines is not supported by the record.

(R. 30-31).

The ALJ discussed these treatment notes in considerable detail, highlighting that even

without psychotropic medications Plaintiff had repeatedly normal mental status examinations

showing stable mood, anxiety under control, appropriate appearance, cooperative demeanor,

normal speech and affect, goal-directed thoughts, intact memory and cognition, abstinence from

drugs and alcohol, and lack of depression, mania, psychosis, perceptual disturbances, or suicidal

thoughts; that individual therapy notes reflected Plaintiff "continu[ing] to work on finding a job

and improving relationships" such as by submitting applications and working through a

disagreement with her significant other, showing insight regarding the negative effects of her

prior substance abuse, and participating in social activities like spending the weekend at a

mountain cabin with a friend, going to an amusement park, and joining a church and attending meetings there; and that group therapy notes indicated that Plaintiff participated in and believed that she benefited from the sessions.  (R. 29-30 (citing R. 788-850, 913-17, 930-1143)). Regarding Plaintiff's GAF scores assessed by Dr. Bickel, the ALJ observed: "Dr. Bickell assessed GAF score ranging between 55 and 70 between March and April 2019, which would indicate no more than moderate symptoms."  (R. 31 (citing R. 694-715, 788-850, 1144-84)). These generally positive treatment notes and mild-to-moderate level GAF scores cited by the ALJ constitute substantial evidence for her conclusion that "the degree of limitation to which [Dr. Bickell] opine[d] is not supported by the record."  (R. 31; *see Burnett*, 220 F.3d at 118 (substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate")).

Plaintiff further argues that "there was no good reason for the ALJ to disregard [her] history of homelessness or her homelessness which occurred during the relevant period." (Reply, ECF No. 12, at 3).  She submits that Plaintiff's homelessness was an "obvious example of marginal adjustment," contrary to the ALJ's determination that "no evidence" of marginal adjustment existed.  (*Id.*).  The Acting Commissioner contends: "Notwithstanding a history of homelessness, much of which predated the relevant period and which the ALJ acknowledged, the ALJ discussed that for most of the period at issue here Plaintiff was not homeless and—rather— lived alone (Tr. 21, 5-0, 241; *see also* Tr. 26, referencing Tr. 705 (explaining that Plaintiff referenced a period of homelessness shortly following her alleged onset date))."

The ALJ's decision is internally inconsistent regarding Plaintiff's homelessness.  As the Acting Commissioner notes, the ALJ acknowledged Plaintiff's history of homelessness, including a period occurring after the February 1, 2018 alleged onset date: "In February 2018,

shortly *after* the amended alleged onset date of disability, the claimant was evaluated at Lenape where she presented to obtain services and expressed an interest in their transitional outpatient support . . . program related to substance abuse rehabilitation. She stated that she was homeless since January . . . ."[9]  (*Id.* at 26 (citing R. 694-715) (emphasis added); *see also* R. 23, 25, 32 (noting earlier periods of homelessness (citing R. 523-27, 578-82, 924-28))).   Nonetheless, despite this acknowledgement of Plaintiff's homelessness during the alleged disability period, the ALJ inexplicably found that "there is no evidence of homelessness after the amended alleged onset date." (R. 21).  Based on the ALJ's own summary of the evidence in this matter, this finding was erroneous.

This error implicates the ALJ's analysis of both the paragraph "B" and "C" criteria.  The ALJ stated her incorrect finding regarding the absence of evidence of homelessness during the alleged disability period in her paragraph "B" evaluation of Plaintiff's ability to adapt and manage herself. (R. 21).  She specifically referenced Plaintiff's lack of homelessness since alleged disability onset as a reason that Plaintiff had only a "moderate limitation" in this area of functioning.  (*Id.*).  However, if the ALJ had not overlooked evidence of Plaintiff's homelessness during the relevant period, she might have found Plaintiff's limitation in adapting and managing herself sufficiently severe to render her disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B) (one "extreme" limitation in this or another listed area would meet the

---

[9]  The underlying record cited by the ALJ is dated February 15, 2022.  (R. 705).  Plaintiff was living in a hotel room at that time.  (*Id.*).  It is unclear how long Plaintiff remained homeless, although the timeline she submitted indicates that in March 2022 she did "not hav[e] an address," which allegedly resulted in her missing a court date and being arrested and jailed for approximately a week and a half.  (R. 926).  After her release, she started at the TOPs program at Lenape in April 2018.  (*Id.*).  An August 29, 2018 assessment performed by Aldie and states that Plaintiff reported that she "was homeless for almost a year until she was set up with housing through Lenape Valley and her case manager."  (R. 938).  As of December 27, 2018, according to her Adult Function Report, Plaintiff was living in an apartment.  (R. 241, 248).

relevant listing).  Further, as noted, the ALJ found that Plaintiff did not meet the paragraph "C" criteria because she lacked evidence of "marginal adjustment," but if the ALJ had not disregarded her most recent episode of homelessness beginning in January 2018 she might have reached a different conclusion on this point.  *See Pierce v. Comm'r of Soc. Sec.*, No. 15-01956, 2016 WL 1643408, at *7 (D.N.J. Apr. 26, 2016) (remanding for "further step three analysis" for Listing 12.04, in part because "the ALJ did not sufficiently contradict" evidence that Plaintiff "was homeless" and "had unstable housing issues").

For these reasons, this matter is remanded for the ALJ to consider the impact, if any,[10] of Plaintiff's homelessness during the period of alleged disability on the evaluation of the paragraph "B" and "C" criteria of Listings 12.04 and 12.06.

### C.      Plaintiff's Remaining Arguments

In Plaintiff's remaining issues raised, she makes three arguments potentially affecting the determination of her RFC: that the ALJ erroneously rejected the opinions of the treating psychiatrist; that the ALJ credited the opinion of the state agency physician but inexplicably failed to include the limitations she assessed in Plaintiff's RFC; and that the ALJ did not include all her credibly established limitations in her RFC (or in the hypothetical posed to the VE). However, the Court need not decide at this time whether any of these issues – which would be addressed later in the five-step analysis – constitute a basis for remand.  If the ALJ determines on remand that the Plaintiff has met a listing at step three, no further analysis will be required. *Milliman v. Berryhill*, No. 16–1279–LPS–MPT, 2017 WL 3912830, at *8 (D. Del. Sept. 7, 2017) ("Analysis stops at this step where the objectively determinable impairment meets or medically

---

[10]  The Court offers no opinion on whether Plaintiff has in fact met the criteria of the relevant listings.

equals one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*."); *see also Steininger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his findings after remand).

## VI.    CONCLUSION

For the foregoing reasons, I find that the ALJ erred by failing to consider evidence of Plaintiff's homelessness during the alleged disability period. Accordingly, Plaintiff's request for review is **GRANTED** to the extent that it requests remand. This matter is remanded to the Acting Commissioner for further proceedings consistent with this memorandum.

BY THE COURT:

 /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge